IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO.: |
| v. | |
| | 1:18-CR-392-AT-JKL-2 |
| AMOS CHRISTOLIN | |

## ORDER AND FINAL REPORT AND RECOMMENDATION

This criminal case is before the Court on Defendant Amos Christolin's motion to suppress statements he made during a custodial interview following his arrest on November 6, 2018.  [Docs. 54, 84, 146.[1]]  Mr. Christolin argues that his *Miranda* waiver was invalid—and, thus, that all of his statements must be suppressed—because the agents did not adequately advise him of his rights in his native language, Haitian Creole, and proceeded with the interview despite what he has characterized as a request to stop.[2]  On May 13, 2021, I held an evidentiary hearing, at which Homeland Security Investigations ("HSI") Special Agent ("SA")

---

[1] Mr. Christolin initially filed, through his previous counsel, a motion to suppress statements on May 3, 2019 [Doc. 54], which he has amended twice [Docs. 84, 146].    Because these motions all seek the same relief—exclusion of statements—I treat the motions as a single motion to suppress statements.

[2] For ease of reference, I will follow the parties' lead and, at times, refer to the Haitian Creole language as simply "Creole" in this report and recommendation.

Jacque Philippe, a Haitian-Creole-speaking agent who participated in the interview, and Nicholas Andre, a linguistic expert in Haitian Creole, testified.  [Doc. 157 (transcript of hearing).]  Following the hearing, Mr. Christolin filed a post-hearing brief [Doc. 163[3]], and the government filed a response [Doc. 164].  Mr. Christolin did not file a reply.[4]  For the following reasons, it is **RECOMMENDED** the motion to suppress [Docs. 54, 84, 146] be **DENIED**.[5]

---

[3] Mr. Christolin's post-hearing brief is erroneously docketed as a separate motion to suppress.  [Doc. 163.]  The Clerk is **DIRECTED** to redocket Doc. Entry 163 as a supplemental brief to Doc. Entry 146.

[4] After the evidentiary hearing, Mr. Christolin filed an Unopposed Motion to Supplement the Record of the Motion to Suppress Statement Hearing.  [Doc. 156.]  That motion is **GRANTED**.

[5] Also pending before the Court is Mr. Christolin's omnibus motion to suppress, filed by his prior counsel, in which he additionally moves to suppress (1) information the government obtained from a third-party Facebook account and (2) a recording of an April 1, 2014 telephone call between Mr. Christolin and a cooperating defendant.  [Doc. 84.]  Because it appeared that Mr. Christolin lacked Fourth Amendment standing to seek suppression of that evidence, I twice ordered Mr. Christolin to perfect his motion if he intended to persist in it.  [Docs. 140, 149.]  Mr. Christolin did not do so, and instead filed only an amended motion to suppress his custodial statements.  Because he declined to perfect his motion as directed, the motion docketed at Doc. Entry 84 is **DEEMED WITHDRAWN** to the extent that it seeks to suppress evidence from Facebook and the recorded call.  [*See* Doc. 34 ("When a party fails to supplement or perfect a motion within the time afforded after having requested or been given an opportunity to supplement or perfect said motion, the Court may deem the original motion abandoned or withdrawn.").]

2

## I.    FACTS

### A.    The November 6, 2018 Interrogation

Mr. Christolin is charged in this case with one count of conspiracy to possess with intent to distribute cocaine and two substantive counts of possession with intent to distribute cocaine.  [Doc. 1.]  On the morning of November 6, 2018, federal and state law enforcement agents arrived at Mr. Christolin's residence in Miami, Florida, to execute a warrant for his arrest on those charges.  [Doc. 157 at 7.]  The record does not reflect the total number of agents that arrived at Mr. Christolin's home, but it is undisputed that only three agents—HSI SAs Jacque Philippe, Matthew DeVane, and Felina Ramirez—went to the front door to make entry.  [*Id.* at 20.]  Mr. Christolin's wife answered the door.  [*Id.* at 7.]  At the time, Mr. Christolin's wife and other family members were at the home, but Mr. Christolin had already left for work.  [*Id.*]  The agents entered the residence, cleared and secured the home, directed everyone out to the front lawn, and directed Mr. Christolin's wife to call him and ask him to return home.  [*Id.* at 7, 20, 40.]

Upon Mr. Christolin's return, he was informed that he was under arrest and directed inside to the kitchen, where SAs Philippe, DeVane, and Ramirez interviewed him at the kitchen table.  [*Id.* at 7-8.]  The agents did not handcuff him, nor did they draw their weapons or use or threaten physical force; and Mr.

3

Christolin was allowed to use the restroom during the interview, which he did. [*Id.* at 8.]   The interview began 15 to 20 minutes after his arrest and lasted approximately an hour and thirty minutes. [*Id.* at 8.]   The agents audio-recorded the interview. [*Id.*; *see also* Doc. 152-1 (transcript of the audio recording).][6]

Because Mr. Christolin speaks Creole, SA Philippe, who also speaks the language, was the primary point of communication.[7]   SA Philippe was born in the United States to parents from Haiti and learned to speak Creole as his first language. [Doc. 157 at 5.]   He frequently uses Creole to speak to suspects and arrestees; he estimates that he has conducted over 50 interviews in the language and informed defendants of their *Miranda* rights between 20 and 30 times. [*Id.* at 6-7.]   In 2016, prior to the interview at issue in this case, he scored a 3 on an HSI

---

[6] A CD containing the audio recording of the interview was admitted into evidence as Government's Exhibit 1 and the government's transcript of the entire interview was admitted as Government's Exhibit 2 [*see* Doc. 152-1]. Mr. Andre's own translation of the first seven minutes of the interview—during which Mr. Christolin was purportedly given his *Miranda* warning and waived his rights—was admitted as Defendant's Exhibit 1 [Doc. 151-1]. Both transcripts provide the dialogue in Creole and the corresponding English translation. There are some discrepancies between the two translations, which I discuss further in context below.

[7] SA Philippe mostly communicated with Mr. Christolin in Creole during the interview; however, at times, Mr. Christolin communicated directly with the agents in English.

proficiency test, where the passing score is 2; more recently, around the end of 2020, he scored a 3+ on the same test.  [*Id.* at 5-6.]

At the beginning of the interview, SA Philippe presented Mr. Christolin with an HSI *Miranda* rights form that explained Mr. Christolin's rights in Creole.  [Doc. 157 at 15; *see also* Doc. 152-2 at 4; Doc. 152-3 (Creole statement of rights form).] SA Philippe read the *Miranda* rights statements from the form to Mr. Christolin in Creole, and paused to ask him to initial after each line to indicate that he understood what SA Philippe read.  [Doc. 157 at 15; Doc. 152-1 at 4; *see* Doc. 152-3.]  Reading from the form, SA Philippe first stated, in Creole, "Before I interview you, it's my duty to inform you of your rights.  Do you understand what I just read?"  [Doc. 152-1 at 4.]  Mr. Christolin responded, "Yes."  [*Id.*]  SA Philippe then asked Mr. Christolin whether he could read, and, in response, Mr. Christolin read the first line of the form out loud in Creole.  [*Id.* at 4-5.]  SA Philippe again confirmed that Mr. Christolin understood that line and directed him to initial the line if he did.  [*Id.* at 5.]  Mr. Christolin initialed the line.  [*Id.*]

SA Philippe then read the next line on the form in Creole, stating "you have the right to remain silent and decline from making any statement."  [Doc. 152-1 at

5.]   SA Philippe asked Mr. Christolin, if he understood, and Mr. Christolin responded "Yeah."  [*Id.*]

Still speaking Creole, SA Philippe moved to the next line, "Any statement you made can be used against you in Courts or any legal institution."  [Doc. 152-1 at 5.]  He then paused and stated "My—Creole is not very strong" and asked Mr. Christolin to read the line himself.  [*Id.* at 5-6]  Mr. Christolin read the line out loud, stating "Any statement you made can be used against you in Courts or in any le-legal institution." [*Id.* at 6.[8]]  SA Philippe asked Mr. Christolin if he understood, and Mr. Christolin responded:  "I don't fully understand this.  So, you can, you can use any statement . . ."  [*Id.*]  SA Philippe retrieved an English language version of the advice of rights form, and told Mr. Christolin in Creole, "this just said . . . everything you tell us . . . we can use in Courts, when we—are in Courts or when we're in front of a Judge."  [*Id.* at 7.]  Mr. Christolin responded "OK."  [*Id.*]

SA Philippe continued, stating in Creole, "you have the right to an attorney before you make any statements and before you answer any questions they may ask you when they are interviewing you."  [Doc. 152-1 at 7.]  He then corrected himself,

---

[8] Mr. Andre's translation of the interview attributes these words to SA Philippe.  [Doc. 151-1 at 1.]  The audio recording of the interview confirms, however, that it was Mr. Christolin who spoke those words, not SA Philippe.

stating "—interrogating you. Do you understand?" [*Id.*] Mr. Christolin responded, "Yeah." [*Id.*] SA Philippe then explained, "You have the right to an attorney . . . a Federal Commissioner, or a US Court may provide you with one, if you cannot afford one yourself. . . . if you cannot afford an attorney, . . . one will be provided to you, if you want." [*Id.* at 8.] Mr. Christolin confirmed that he understood. [*Id.*]

SA Philippe then advised Mr. Christolin, in Creole, "If you're willing to immediately answer all the questions you are asked . . . without an attorney present with you, you can, at any time request the interview is stopped and consult an attorney. This is your right. Do you understand what that says?" [Doc. 152-1 at 9.] Mr. Christolin again responded, "Yeah." [*Id.*] SA Philippe then paraphrased, "So, when we are talking to you, at any times [sic], you can tell, um, you want an attorney, and then we will stop talking to you." [*Id.*] Mr. Christolin responded "OK." [*Id.*] Reading from the Creole form, SA Philippe stated, "You also have the right to waive the assistance of an attorney, and also the right to remain silent. Also, if you are willing, you may make all your statement without consulting an attorney. Just say whether you understand?" [*Id.* at 10.] Mr. Christolin responded, "No, do I put initial?" [*Id.*] SA Philippe, replied, "No, you will initial here to state

if you understand."[9]  [*Id.*]  Mr. Christolin responded "Uh, OK," and initialed the

form.  [*Id.*; Doc. 152-3.]

Then the following exchange took place:

| | |
|---|---|
| SA Philippe: | Now, I will ask you if you wish to speak with us.  We'll explain to you what's going on. You can give us, give, give us back your response. |
| Mr. Christolin: | All right! |
| SA Philippe: | So, are you willing to speak with us? |
| Mr. Christolin: | No, I'm willing to listen! |
| SA Philippe: | No, I am asking if you want to speak with us. You will need to sign—if you're willing to speak with us, you will sign here, to state that you are willing to speak with us.  Um, and then, I will sign, um, another person will sign. And then, like I said, you can begin speaking with us, anytime you can stop speaking with us, if you want to. |
| Mr. Christolin: | Yeah, OK. |
| SA Philippe: | So, are you willing to speak with us? |
| Mr. Christolin: | Yeah. |

---

[9] Mr. Andre's translation indicates that SA Philippe told Mr. Christolin, "No, you will initial here to say ***that*** you understand."  [Doc. 151-1 at 3.]  I will address the difference in the translation in the discussion below.

8

[Doc. 152-1 at 11.]  Mr. Christolin then initialed the form, SA Philippe marked the time the waiver was completed, and the agents began the interview.  [Doc. 152-3.]

During the interview that followed, Mr. Christolin made incriminating statements, including admitting to his nickname "Patizan" [Doc. 152-1 at 31], his phone number [*id.* at 17], and that he met someone matching the description of V.J., an individual who transported drugs to the Atlanta area [Doc. 152-2 at 33].

### B.     Nicholas Andre's Testimony

The linguistic expert, Nicholas Andre, teaches Haitian Creole and French at Florida International University, where he is the director of Haitian studies.  [Doc. 157 at 48-49.]  He also works occasionally as a translator.  [*Id.* at 48.]

Mr. Andre opined that SA Philippe is "a heritage learner" of Creole, meaning that he learned it from his parents speaking the language rather than from growing up in a country where the language is spoken.  [Doc. 157 at 53.]  According to Mr. Andre, SA Philippe can understand Creole, but cannot speak it fully.  [*Id.*]  In Mr. Andre's opinion, SA Philippe is not sufficiently proficient in Creole to convey the *Miranda* warning to someone unfamiliar with it.  [*Id.* at 63.]

### II.    ARGUMENTS OF THE PARTIES

Mr. Christolin argues that SA Philippe did not adequately communicate the *Miranda* warnings to him in Creole, and, as a result, he did not understand his rights

or the consequences of waiving them.  He further argues that he was coerced into waiving his rights because the agents continued with the interview despite his invocation of his right to remain silent when he stated, "No, I'm willing to listen!" Mr. Christolin argues that these actions were coercive and deceptive, that he lacked full awareness of his rights and the consequences of waiving them, and that, as a result, the government cannot meet its burden to show that his waiver was voluntary.

The government counters that Mr. Christolin's waiver was voluntary because:  none of the agents threatened, intimidated, or made promises to him to force him to waive his rights; they did not yell at him, point their guns at him, or use physical force; he was not handcuffed or physically restrained; and the interview occurred in Mr. Christolin's home around his kitchen table.  The government further contends that Mr. Christolin had the requisite level of comprehension of his rights and the consequences of waiving them because he was fully advised of his rights in Creole both in writing and verbally; he indicated, also verbally and in writing, that he understood his rights; and he willingly agreed to waive his rights and speak with the agents.

## III.   ANALYSIS

In *Miranda v. Arizona*, the Supreme Court created a presumption that statements elicited during a custodial interrogation are coerced, and, thus, not admissible at trial, unless a suspect is first advised of certain constitutional rights, namely, "[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."   384 U.S. 436, 479 (1966).   "The government has the burden of showing the knowing and intelligent nature of a waiver."   *United States v. Farley*, 607 F.3d 1294, 1326 (11th Cir. 2010).   The court's inquiry has "[t]wo distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).   "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quotation omitted).   The totality of all the

surrounding circumstances includes "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The government bears the "heavy burden" of establishing a defendant's statements were obtained in compliance with *Miranda.  See United States v. Harris*, 151 F. App'x 882, 885 (11th Cir. 2005) (citation omitted).[10]

With these principles in mind, I first address the voluntariness of Mr. Christolin's waiver, that is, whether it was the product of intimidation or coercion. Next, I turn to whether Mr. Christolin's waiver was competently made, including whether the *Miranda* warnings were constitutionally adequate and whether Mr. Christolin's waiver was knowing and intelligent.

### A.    Whether the Waiver Was the Product of Mr. Christolin's Free and Deliberate Choice

As noted above, for a defendant's waiver to be valid, it must be the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran*, 475 U.S. at 421.   Improperly "coercive conduct normally involves

---

[10] I note that the "voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver." *United States v. Byrd*, No. 1:16-CR-315-TWT-AJB, 2017 WL 3821696, at *5 (N.D. Ga. Aug. 7, 2017), *report and recommendation adopted*, 2017 WL 3783029 (N.D. Ga. Aug. 31, 2017).  However, Mr. Christolin does not argue that any of his statements were themselves involuntarily; rather, he only challenges the validity of his *Miranda* waiver.

subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1373 (N.D. Ga. 2012), *report and recommendation adopted at id.* at 1353-54. Here, the agents did not subject Mr. Christolin to anything approaching this sort of coercive mistreatment. None of the agents threatened, intimidated, or made promises to him to force him to waive his rights. Nor did they yell at him, point their guns at him, or use physical force. He was not handcuffed or physically restrained at any point during the interview, which took place in his home at his kitchen table, and he was permitted to leave to use the restroom. The audio recording itself indicates that Mr. Christolin was attentive and responsive to questions throughout the entire interview. Simply put, none of the circumstances surrounding his waiver—or even the interview more generally—inhibited Mr. Christolin's ability to exercise free choice.

Mr. Christolin nevertheless argues that he was "coerced" into waiving his rights because the agents did not stop the interview after he said, "No, I am willing to listen!" in response to SA Philippe's question as to whether he was willing to

speak to the agents.[11]  [Doc. 163 at 12.].   Generally, if "a person undergoing a custodial interrogation states that he wishes to remain silent the questioning must end."  *United States v. Ochoa*, 941 F.3d 1074, 1098 (11th Cir. 2019), *cert. denied*, 140 S. Ct. 2553 (2020) (quoting *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004)).   But questioning must stop only where the invocation of his rights is "unequivocal."  *Id.* (citing *Davis v. United States*, 512 U.S. 452, 461-62 (1994)).  "The inquiry as to whether a suspect's invocation of his right to remain silent was ambiguous or equivocal is an objective one" such that the "suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of

---

[11] Mr. Christolin also argues that he was coerced into waiving his rights because the agents ignored his statements that he did not understand SA Philippe's *Miranda* warning, did not let him read the Creole waiver form, and failed to adequately translate the warnings into Creole.  *Cf. Farley*, 607 F.3d at 1328-29 (stating that a defendant's waiver may be involuntary "where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them" such as telling a suspect that having a lawyer present would be a "disadvantage" and that "honesty wouldn't hurt him" or telling an illiterate defendant that signing a waiver form "would not hurt him") (citations omitted).  The sufficiency of the *Miranda* warning and Mr. Christolin's understanding of those warnings are addressed in the next section, which deals with whether his waiver was knowing and intelligent.

the right to remain silent." *Medina v. Singletary*, 59 F.3d 1095, 1101 (11th Cir. 1995)).

Here, Mr. Christolin's statement "No, I am willing to listen" is not an unequivocal invocation of his right to remain silent because it does not express a desire to end contact with the agents.  Despite prefacing the statement with the word "no," Mr. Christolin's response contemplates some degree of continued communication with the agents and, thus, "cannot possibly be construed as a request for the . . . agents not to speak to him or for him to remain silent." *United States v. Washington*, 462 F.3d 1124, 1134 (9th Cir. 2006) (finding defendant's statement to FBI agents, "I agree to listen," was not an unequivocal invocation of his right to remain silent).  Since Mr. Christolin's response was not an unequivocal invocation of his right to remain silent, the agents were not obligated to stop the interview; and thus, it cannot be said that the agents' mere failure to stop the interview was sufficiently coercive to render the waiver invalid.

Mr. Christolin still argues that he was "coerced" into waiving his rights because, after he said "No, I'm willing to listen!", SA Philippe did not also explain that he had options other than to waive his rights and speak with the agents—for example, that he had the right to remain silent and the right to have an attorney

15

present for any statements he made.  [Doc. 163 at 13.]  But Mr. Christolin cites no authority for the proposition that under these circumstances, SA Philippe was required to start afresh and readminister all of the *Miranda* warnings before continuing, and the Court is aware of none.  In any event, in response to Mr. Christolin's statement, SA Philippe calmly clarified what he was telling Mr. Christolin, stating, "No, I am asking if you want to speak with us.  You will need to sign–if you're willing to speak with us, you will sign here, to state that you are willing to speak with us."  [Doc. 152-1 at 11.]  Mr. Christolin then indicated that he understood; after that, SA Philippe again asked if he would be willing to speak to the agents, and Mr. Christolin affirmed that he was.  [*Id.* at 11-12.]  SA Philippe's insistence on obtaining a written waiver from Mr. Christolin as a condition to his speaking with the agents, therefore, can hardly be seen as having been coercive.

In sum, Mr. Christolin's encounter with the agents bears none of the hallmarks of coercive or intimidating conduct that inhibited Mr. Christolin's ability to exercise his free choice to waive his rights and speak to the agents.  Accordingly, the undersigned finds that Mr. Christolin's waiver was voluntary.

### B.    Whether Mr. Christolin's Waiver Was Knowing and Intelligent

I turn next to the adequacy of the *Miranda* warnings Mr. Christolin received and whether Mr. Christolin's waiver was knowing and intelligent—*i.e.*, whether he

16

waived his rights with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.

There is no dispute that the SA Philippe *attempted* to advise Mr. Christolin of his rights.   The question, instead, is whether those warnings *adequately* conveyed to Mr. Christolin the rights he had such that his waiver was knowing and voluntary.   Mr. Christolin argues that SA Philippe did not accurately or completely warn him of his rights under *Miranda* because his Haitian Creole was deficient.   I disagree.

In *California v. Prysock*, the Supreme Court clarified that the rigidity of *Miranda* does not "exten[d] to the precise formulation of the warnings given a criminal defendant," and that "no talismanic incantation [is] required to satisfy its strictures."   453 U.S. 355, 359 (1981).   "The prophylactic *Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" *Duckworth v. Eagan*, 492 U.S. 195, 203, (1989) (citing *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)).   Therefore, a court considering the sufficiency of a *Miranda* warning "need not examine [it] as if construing a will or defining the terms of an easement."   *Id.*   Rather, the court should inquire "simply whether the warnings

17

reasonably convey to a suspect his rights as required by *Miranda*." *Id.* (cleaned up) (quoting *Prysock*, 453 U.S. at 361).

Applying these principles here, the warnings as conveyed by SA Philippe—both in writing and verbally—were constitutionally adequate because they "touched all of the bases required by *Miranda*." *Duckworth*, 492 U.S. at 203; *see also United States v. Hernandez*, 93 F.3d 1493, 1502 (10th Cir. 1996) ("A suspect's *Miranda* rights need not be perfect if the defendant understands that he or she need not speak to the police, that any statement made may be used against him or her, that he or she has a right to an attorney, and that an attorney will be appointed if he or she cannot afford one."). For starters, contrary to Mr. Christolin's assertion that he had no opportunity to read the Creole advice-of-rights form [*see* Doc. 163 at 20], the record demonstrates that Mr. Christolin, in fact, was permitted to read from the form, and even did so out loud [Doc. 152-1 at 5, 6].[12] And there is nothing to suggest that the advice-of-rights form did not adequately convey the substance of his rights under *Miranda*. Mr. Christolin's receipt and initialing of the written

---

[12] Mr. Christolin's assertion that he did not have an opportunity to read the form appears to be based on Mr. Andre's mistaken belief that SA Philippe did not pause for him to read the form after advising him that any statement he made could be used against him. [Doc. 157 at 56-57.] But as discussed in note 8 above, Mr. Christolin read aloud the statement of this right from the advice-of-rights form.

advice-of-rights form is, therefore, strong evidence that he was adequately advised of his rights. *See United States v. Boon San Chong*, 829 F.3d 1572, 1574-75 (11th Cir. 1987) (finding that defendant's "election to answer questions shortly after reading the Chinese Advice of Rights form indicates he was knowingly waiving his rights, despite language problems"); *see also United States v. Gonzales*, 749 F.2d 1329, 1336 (9th Cir. 1984) (stating that the availability of a waiver form advising defendant of his *Miranda* rights in his native language "would have conveyed to appellant a sufficient understanding of his rights" even if the law enforcement agent spoke defendant's native language "very poor[ly]).

The undersigned further finds that SA Philippe's verbal advice of rights, while not perfect, was sufficient to inform Mr. Christolin of his rights under *Miranda*. To recap, SA Philippe verbally advised Mr. Christolin of the following in Creole:

- "[Y]ou have the right to remain silent and decline from making any statement." [Doc. 152-1 at 5.]

- "Any statement you made can be used against you in Courts or any legal institution" and "everything you tell us . . . we can use . . . in Courts or when we're in front of a Judge." [*Id.* at 5, 7]

19

- "[Y]ou have the right to an attorney before you make any statements and before you answer any questions they may ask you when they are interviewing you. . . . –interrogating you." [*Id.* at 7.]

- "[Y]ou have the right to an attorney, a Federal Commissioner, or a US Court may provide you with one, if you cannot afford one yourself" and "if you cannot afford an attorney . . . one will be provided to you, if you want." [*Id.* at 8.]

- "If you're willing to immediately answer all the questions you are asked . . . without an attorney present with you, you can, at any time, request that the interview is stopped and consult an attorney.  This is your right." [*Id.* at 9.]

Mr. Christolin responded, in each instance, that he understood what SA Philippe told him, including his right to remain silent, to have attorney present prior to making any statements, to have an attorney appointed to represent him if he cannot afford one, and to request a lawyer at any time. [Doc. 152-2 at 5, 7-9.] And when Mr. Christolin stated that he did not understand the portion of the advisement that anything he said can be used against him in a court of law, SA Philippe

20

translated from the English-language version of the form to help explain the right in Creole.  [*Id.*at 6-7.]  Mr. Christolin then responded "OK."[13]  [*Id.* at 7.]

Even so, Mr. Christolin argues that SA Philippe's verbal advisement of rights was inadequate because he used (1) the English words for "use" and "court" when advising Mr. Christolin that anything he told the agents could be used against him in court, rather than translating the words into Creole;[14] and (2) gibberish words, such as "komisye" that lack meaning in Creole, when explaining Mr. Christolin's right to an attorney.  [Doc. 163 at 5, 7, 10; Doc. 157 at 59; *see* Doc. 151-1 at 2; Doc. 152-1 at 8.]

---

[13] Citing Mr. Andre's translation of the interview, Mr. Christolin argues that SA Philippe initially advised that "they ***may*** be able to use any statement you make against you," instead of advising that his statements can be used against him. [Doc. 163 at 6 (emphasis added) (citing Doc. 151-1 at 1).]  Even if SA Philippe's use of the word "may" instead of "can," was confusing or misleading, Mr. Andre's translation shows that SA Philippe went on to clarify the statement, telling Mr. Christolin, "This just says, everything you tell us, we ***can*** use it in court when we are in court or when you appear in front of a Judge." [Doc. 151-1 at 2 (emphasis added).]  *See United States v. Youte*, 769 F. App'x 685, 688 (11th Cir. 2019) (finding *Miranda* waiver adequate where agent clarified potentially misleading word when translating warnings).

[14] According to the government's translation, SA Philippe stated, "OK. M ap eksplike pou w kibo.  OK, uh, sa jis di, urn, tout bagay ou di nou, um, nou ka ***use*** li nan ***Court***, le nou—nan Tribinal or le w al we yon jij." [Doc. 152-1 at 7 (emphasis added to show use of English terms).]

21

The undersigned finds that these imperfections did not prevent Mr. Christolin from understanding the substance of what SA Philippe said. Significantly, Mr. Christolin repeatedly indicated to SA Philippe that he understood what he was being told. [*See* Doc. 152-1 at 7, 8.] Indeed, Mr. Christolin never expressed any confusion outside of a single point of clarification—when Mr. Christolin expressed to SA Philippe that he did not understand SA Philippe's statement that anything he said can be used against him in court, which prompted SA Philippe to explain the point for him. Were this not enough, the transcript of the interview shows Mr. Christolin repeatedly conversing with the agents in English without translation. For example, he responded to SA Philippe asking in English "How are you doing today?" [Doc. 152-1 at 12]; he responded in English to questions in English about his demographic information and cell phones found in his possession [*id.* at 15-21]; and he responded *in English* to questions asked in English (without translation assistance) [*id.* at 32, 36]. Indeed, Mr. Christolin, speaking in English himself repeatedly used the verb "use" in response to a question from SA DeVane about whether the agents could search a cell phone. [Doc. 152-1 at 17 (stating "But I never use this [phone]. I, I don't use it. I just have it . . . but I don't use this one.").] Finally, Mr. Christolin himself confirmed to the

agents that he understood SA Philippe's Creole.  [Doc. 152-1 at 21 (SA DeVane: "Have you understood everything [SA Philippe] has asked you in Creole?" Mr. Christolin: "Yeah.").[15]   All of this leads me to conclude that Mr. Christolin understood SA Philippe's statements.

Mr. Christolin nevertheless complains that when SA Philippe finished his "convoluted reading of *Miranda*," he asked Mr. Christolin "if he understands," and Mr. Christolin replied, "'No' (in Creole) and further asked the agent where to sign." [Doc. 163 at 10.]   The record does not support this assertion.   First of all, SA Philippe did not simply recite the *Miranda* warnings and then ask Mr. Christolin if understood; rather, SA Philippe went through the advice-of-rights form sentence-by-sentence, stopping and confirming after each that Mr. Christolin understood. Moreover, the particular portion of the interview that Mr. Christolin refers to is when SA Philippe read Mr. Christolin the part of the waiver form stating that,

---

[15] In an earlier iterations of his motion to suppress, Mr. Christolin asserted that SA Philippe "failed to inform [him] that any statement could be used 'against' him in a court of law."  [Doc. 146 ¶ 10.]  To the contrary, SA Philippe did use the word "against" when reading the form.  [Doc. 152-1 at 5.]  Moreover, Mr. Christolin himself read out loud the part of the form where it advised him that his statements can be used "against" him.  [*Id.* at 6.]

despite having the rights he had been advised of, Mr. Christolin was free to waive

those rights:

> SA Philippe:    OK. You also have the right to waive the assistance of an attorney, and also the right to remain silent. Also, if you are willing, you may make all your statement without consulting your attorney.   Just say whether you understand?
>
> Mr. Christolin:    No, do I put initial?
>
> SA Philippe:    No, you will initial here to state if you understand.
>
> Mr. Christolin:    Uh, OK.

[Doc. 152-1 at 9.]  This exchange, when viewed in context, shows that SA Philippe

found that Mr. Christolin's response "No, do I put initial?" to be vague, so he

clarified that if Mr. Christolin understood what he had been advised—namely, that

Mr. Christolin should initial the form "if [he] underst[oo]d," which Mr. Christolin

did without asking any other explanatory questions.[16]  [*See* Doc. 152-3.]

---

[16] Mr. Christolin argues, citing Mr. Andre's translation of the interview, that SA Philippe told him, "no, you will initial here to say ***that*** you understand" instead of "***if*** you understand" and, thus, the statement was a command.  [Doc. 163 at 7, 11; *see* Doc. 151-1 at 3.]  Although Mr. Andre's translation could be interpreted as a command when viewed in isolation, the tone of SA Philippe's voice did not suggest that he was commanding Mr. Christolin to mark his initials next to the line regardless of whether he understood, and more broadly, throughout the entire interview, Mr. Christolin understood that he was to initial the advice of rights form

Mr. Christolin also argues that his waiver was not knowing or voluntary because, being from Haiti, he was not familiar with the concept of *Miranda* rights. [Doc. 163 at 16-17.]  This argument is not persuasive for several reasons.  To start, the only evidence that he cites to support this assertion is Mr. Andre's testimony that in Haiti there is no right to remain silent and that the concept would be unfamiliar to a Creole person.  [Doc. 157 at 63.]  Mr. Andre's general demographic testimony, however, says nothing about what level of understanding Mr. Christolin himself had at the time he was arrested, especially in view of the fact that Mr. Christolin was living in the United States and had previously personal experience with the American criminal justice system, having been arrested for driving under the influence.  [Doc. 152-1 at 3.]  But even if Mr. Christolin were unfamiliar with the concept of *Miranda* warnings at the time of his arrest in this case, as discussed above, SA Philippe adequately advised him of his *Miranda* rights in Creole, and Mr. Christolin indicated both verbally and in writing that he understood his rights. "These facts, coupled with the lack of any circumstances suggesting coercion on the part of [the agents], allow a finding of voluntary waiver."  *United States v.*

---

to indicate he understood what SA Philippe was telling him.  It thus stands to reason that Mr. Christolin did not interpret this sentence as a command.

25

*Lopez-Garcia*, No. 1:07-CR-271-ODE-RGV, 2008 WL 11439397, at \*13 (N.D. Ga. Jan. 14, 2008) (finding that defendant made a voluntary, knowing, and intelligent waiver of his Miranda rights where he was informed of his rights in his native language and indicated that he understood those rights), *report and recommendation adopted*, 2008 WL 11439396 (N.D. Ga. Feb. 8, 2008).

In the end, the case at bar is similar to *United States v. Youte*, where a Creole-speaking defendant moved to suppress statements he made after being Mirandized by SA Philippe—the same agent involved in Mr. Christolin's interview.  In that case, Youte argued that SA Philippe failed to adequately warn him that his statements could be used against him in court because SA Philippe told him, "Anything you tell us . . . We can use it in court," but he did not translate the word "use" into Creole and did not say that his statements could be used ***against*** him. *Youte*, 769 F. App'x at 688.  Youte also argued that SA Philippe did not properly advise him that he was unconditionally entitled to have a lawyer with him during questioning because SA Philippe stated only that Youte had the "right to contact an attorney before you make any statements," "the right to have an attorney present with you while being questioned," and that if "you cannot pay an attorney yourself . . . they will appoint you one before if you need one. [Umm]  If you

26

want." *Id.* The Eleventh Circuit found that the translation deficiencies were too minor as to render the *Miranda* warning incomplete since Youte stated that he understood what SA Philippe said to him and did not appear confused or ask for clarification. *Id.* Youte also understood some English, as evidenced by his interactions and conversations in English with a customs agent. *Id.* at 688 n.3. As to the warning about his right to have a lawyer present, the court found that that any inaccuracies were immediately corrected and clarified. *Id.* at 688. As the court explained:

> [D]espite the inelegant translation by Agent Philippe, neither of these two requisite components of a Miranda warning was lacking. A suspect's difficulties with English do not preclude the possibility of receiving adequate Miranda warnings, especially when he unequivocally states that he understands the rights of which he has been informed. Given that the Supreme Court "has not dictated the words in which the essential information [of the *Miranda* warnings] must be conveyed," the district court did not err when it concluded that Youte received that essential information.

*Id.* (citations omitted). The same analysis applies to SA Philippe's efforts to communicate with Mr. Christolin in this case. Despite delivering an imperfect translation of Mr. Christolin's *Miranda* rights, Mr. Christolin was sufficiently

27

advised of his rights; adequately affirmed that he understood those rights; and, thus, his waiver was knowing and voluntary.[17]

In sum, bearing in mind the Supreme Court's admonition that "no talismanic incantation [is] required to satisfy" the "strictures" of *Miranda*, *Prysock*, 453 U.S. 359, in light of Mr. Christolin's repeated statements that he understood the rights of which he was advised, and his initialing the Creole advice-of-rights form, the *Miranda* warnings were sufficient to convey the essence of Mr. Christolin's rights to him. *Youte*, 769 F. App'x at 688. At worst, the problems with SA Philippe's verbal advisement go only to the "form or phrasing" of the warnings, not the substance of his rights. *Cf. United States v. Street*, 742 F.3d 1298, 1311-12 (11th Cir. 2006) (finding *Miranda* warning inadequate where agent fully omitted advice

---

[17] It is not lost on the Court that this is at least the second time a defendant has challenged the sufficiency of a *Miranda* warning translated by SA Philippe into Creole. [*See generally* Doc. 156-1 at 29-47 (transcript of May 4, 2017 evidentiary hearing).] Even so, "the Fifth Amendment does not codify a 'best practices' manual for interrogations," so the fact that SA Philippe's translation was imperfect is not determinative. *United States v. de Alejo*, No. 21-20069-CR, 2021 WL 4751271, at *7 (S.D. Fla. Oct. 2, 2021), *report and recommendation adopted*, 2021 WL 4749797 (S.D. Fla. Oct. 12, 2021). Further, I do not credit Mr. Andre's opinion that SA Philippe lacks sufficient proficiency in Creole to convey the *Miranda* warning to someone unfamiliar with it. SA Philippe grew up speaking the language and has passed proficiency tests. It is also clear from the interview itself that Mr. Christolin understood what SA Philippe was saying.

28

that anything defendant said could be used against him in a court of law and that if he could not afford an attorney one would be appointed for him and distinguishing problems merely involving the "form or phrasing" of a right).   As a result, considering the totality of the circumstances, I find that Mr. Christolin made an uncoerced choice and possessed the requisite level of comprehension to validly waive his *Miranda* rights.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned finds that the warnings that SA Philippe were adequate and that considering the totality of the circumstances, Mr. Christolin made a voluntary, knowing, and intelligent waiver of his *Miranda* rights, which rendered his statements during the interview admissible.   Accordingly, it is **RECOMMENDED** that Mr. Christolin's motion to suppress his statements be **DENIED**.   [Docs. 54, 84, 146]

Separately, it is **ORDERED** that Mr. Christolin's Unopposed Motion to Supplement the Record of the Motion to Suppress Statement Hearing be **GRANTED**.   [Doc. 156.]

The Clerk is **DIRECTED** to redocket Doc. Entry 163 as a supplemental brief to Doc. Entry 146.

Lastly, the following motions have been **DEFERRED** to the District Judge: (1) the Government's motion in limine to preclude evidence and argument on Haitian Culture [Doc. 66]; (2) its motion to allow cocaine in courtroom [Doc. 67]; and (3) its motion in limine to introduce evidence of bad acts under Federal Rule of Evidence 404(b) [Doc. 78].[18]

I have now addressed all referred pretrial matters relating to Mr. Christolin, and I have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO ORDERED and RECOMMENDED** this 19th day of November, 2021.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[18] Predecessor counsel for Mr. Christolin filed a response to the government's motion in limine regarding the introduction of 404(b) evidence. [Doc. 104.] I gave successor counsel an opportunity to file a supplemental response to the motion [Doc. 149]; however, as of the date of this report and recommendation, no supplemental response has been filed.